[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a negligence action resulting from the plaintiff falling as he was descending a gangway or ramp at premises owned, occupied, controlled, possessed and maintained by the defendant, Mystic River Properties d/b/a Brewer's Yacht Yard, Inc. at Murphy Point in Mystic, Connecticut, hereafter "Marina". This was a court trial in which this court heard evidence on August 13, 14, 15, 18, and 20, 1997. Both parties submitted post trial briefs in early September 1997.
The court is basing its findings of fact upon the exhibits admitted into evidence, the Stipulation of Facts (Court Exhibit 1, hereafter "Stipulation") and the credibility of the witnesses who testified. Their credibility is based upon their conduct and demeanor on the witness stand, the manner in which they responded to questions, consistencies and inconsistencies in what they said, their ability to recall certain events or conditions as well as their interest in the outcome of the case, and in the case of expert witnesses, their training, experience and knowledge of the subject about which they testified as well as the aforementioned criteria which applied to all witnesses.
The court finds the following:
A: LIABILITY:
1. The plaintiff, a 22 year veteran Glastonbury, Connecticut police officer, while descending the gangway/ramp leading to "G" dock located along the easterly side of the defendant's property (hereinafter also called the "Marina"), on Monday, May 15, 1995, slipped and fell on said gangway/ramp at approximately 3:15 p.m. Said premises were owned, occupied, controlled, possessed and maintained by the defendant at that time and date and for several years prior thereto. See Stipulation and Defendant's Admissions to paragraphs 1 and 2 of the Second Amended Complaint. CT Page 10392
2. A gangway is described as a sloping structure leading from one fixed location, in this case the parking area, to a movable location, in this case "G" dock which is a floating dock and which results in the gangway bottom rising and falling with the tide; although a ramp is more commonly described as a fixed structure at top and bottom. The parties have used the terms interchangeably, "ramp" in the Stipulation and "gangway" and "ramp" in the testimony.
3. Plaintiff had paid to rent a slip at the marina where he docked his boat. Therefore, as he was walking down the gangway/ramp to G dock to reach his boat, he had the status of a business invitee.
4. The gangway/ramp was inherently dangerous primarily because of its sharp slope downward[1] which was at its most severe slope at the time of plaintiff's fall when the water was at the lowest tide it usually reached, causing G dock to drop to its lowest point and correspondingly causing the bottom of the gangway/ramp to be at its lowest level, thereby maximizing the angle of its slope.
5. A film of water on the wood flooring of the gangway/ramp resulting from rain that morning caused the wood to be slippery. See testimony of Charles McSheffrey, registered architect and professional engineer, and testimony of John Carr of the Stonington, Connecticut Police who stated that it was "slippery from the recent rain". This type of condition was present on many prior occasions when it had rained.
6. The steel underpart of the gangway/ramp on which the plaintiff fell was constructed on May 9, 1989 by a third party. The wooden ramp/gangway on top of the steel underpart and on which the plaintiff fell was constructed by employees of the defendant, including Edward Ahlborn, the current manager of the Marina.
7. The gangway/ramp was constructed of pressure treated wood of 2" X 6" boards. Pressure treated wood cleats were placed on every other board. The cleats were 1 1/2" thick (height) and 1 1/2" wide. Approximately 10 1/2" of decking was between each cleat. The cleats were 3' 4" in length. The cleats present a the time of the fall had been placed there in August of 1993 approximately 21 months prior to the fall. According to the CT Page 10393 Marina manager new cleats are installed every two years. The cleats had been there just three months short of being replaced. They were old and according to Mr. McSheffrey, they were worn. According to Ramon Serbia, the State Building Inspector and aneutral witness, the older the wood is the more slippery it is.
8. To reach the angle needed to make the slope safe, the gangway/ramp would have to be between 50'-100' long, which the court recognizes would be impractical, but is all the more reason other measures should have been taken to make the gangway/ramp safer.
9. Plaintiff's boat was docked at a location for which he usually used the gangway/ramp, which was aluminum, to "F" dock. Therefore, the court believes at the time of the fall was the first time the plaintiff went down the gangway/ramp to G dock.
10. There was no slip resistant material on the gangway/ramp except for the wood itself, including the cleats, which were old and worn.
11. The wood decking of the ramp and the cleats were not sufficiently slip resistant to provide reasonable safety for those using the gangway/ramp.
12. The handrails were inadequate. Both Ramon Serbia and defendant's expert, David Wiggin, testified that it would be easier to grab and hold onto round handrails rather than the type, angle iron, that were on the G dock gangway/ramp.
13. The plaintiff placed his heel between the cleats closer to the one behind his heel, and the wet surface of the deck caused his heel to slip forward to the next cleat, a sufficient distance to cause him to start falling before his heel hit the said next cleat. The point where the slip started was too far from the said next cleat to allow him to get the sole of his foot onto the said next cleat before falling. Both Mr. Wiggin and Mr. Ahlborn, testifying for the defendant, admitted that there were no instructions as to how to walk on the gangway/ramp and that it was up to the individual as to how he walked thereon. The plaintiff not putting his foot on the cleat or not putting his heel closer to the said next cleat was not a misuse of the gangway/ramp.
14. The court finds, based upon the totality of the CT Page 10394 evidence, that the defendant was negligent in the way it constructed, without sufficient slip resistant materials, inspected and maintained the subject gangway/ramp. The gangway/ramp was dangerous because of its excessive slope, lack of sufficient slip resistant surfaces, (on its deck and cleats), and the lack of adequate handrails. Additionally, the defendant had not installed any warning or notice signs to warn of the dangerous condition. The defendant's witness, Ramon Serbia, testified that in view of the steep slope, a warning sign should have been in place.
15. The defendant's negligence was in breaching its duty to the plaintiff to keep its premises reasonably safe and to take reasonable precautions to prevent injury to the plaintiff. The plaintiff was a business invitee, i.e. one who enters upon land or the purpose directly or indirectly of doing business with the possessor of such land. The plaintiff entered upon the premises pursuant to a lease for which he paid for the purpose of docking and using his boat at the marina owned and possessed by the defendant. The plaintiff's activities were those for which he paid and the leasing to the plaintiff as aforesaid was the business in which the defendant was engaged. Of all people using another's land, the highest duty of care is owed to a business invitee. Defendant's breach of that duty was a substantial factor in causing, and was the proximate cause of, plaintiff's injuries.
16. This is all the more noteworthy because of the alternatives that were available to the defendant to deal better with this dangerous condition. One alternative was to install in place of the subject gangway/ramp the same type of aluminum gangway/ramp that it had installed leading to F dock. Defendant's expert, Richard Ziegler, stated that an aluminum ramp provides very good skid resistance. Mr. Ahlborn, defendant's manager, testified that the aluminum ramp was better slip resistant than the G dock ramp. Mr. McSheffry testified slip resistant tapes and paint with abrasive additives would help. Mr. Ziegler said slip resistant tapes would provide an effective slip resistant surface. Mr. Ahlborn admitted that he knew these products were easily available, but they were not used. Of course, a warning sign could have been utilized, but it never was.
17. Defendant claims that it had to have actual or constructive notice of the dangerous condition in order for it to CT Page 10395 be liable. However, the Appellate Court's recent decision inTuite v. Stop Shop Cos., 45 Conn. App. 305, 308 (June, 1997) holds to the contrary. "It is well established that a plaintiff does not have to prove that a defendant had actual or constructive notice of a dangerous condition when the plaintiff claims that the defendant's employees created the condition." citations omitted. Here, the defendant's employees created the condition when they constructed and installed a gangway/ramp that did not have sufficient slip resistant materials, that had inadequate handrails and was inherently dangerous because of its excessive slope for which insufficient safety precautions were taken to offset the steep slope. In Zarembski v. Three LakesParks, Inc., 177 Conn. 603, 607 (1979) the court held that a construction company had actual notice of a dangerous condition its employees created. The factual situation there is more similar to the case at bar. Tuite, supra, also states "In these types of cases, the defendant is deemed to have actual notice of the dangerous condition that its employees created." Id. 309. Further, Zarembski, supra, also stated that ". . . where there is evidence that a dangerous condition has existed for a reasonable length of time it would also support a claim of constructive notice." Id. 607. In the case at bar the cleats had been in place for 21 months and the gangway/ramp since 1989. It is a reasonable inference that the defendant, through its manager, employees, etc., were aware of the condition of the gangway/ramp as they no doubt used it frequently during dry and wet weather. The defendant simply and incorrectly did not consider the condition dangerous. Accordingly, the court finds that the defendant had actual and constructive notice of the dangerous condition.
B: DAMAGES:
As a proximate cause of the defendant's negligence, the plaintiff ruptured the quadriceps tendon of the left knee. He was in great pain immediately after the fall. Following surgery on May 15, 1995 to repair the knee, he began a very difficult recovery. He needed a catheter in order to urinate. He became nauseous and vomited. He continued to be in pain. Upon discharge from the hospital, he was placed in a knee immobilizer and then a motion brace. He started a course of physical therapy that lasted until late July, 1995 and then into September. He improved by September, but in November his condition required another operation to cure the stitch bursitis that had developed in his knee. By May 13, 1996, almost one year after the date of CT Page 10396 the accident, the plaintiff had reached maximum medical improvement and was given a 10% permanent partial disability of his left knee. He also has a permanent five inch scar; from the surgery, on and above his left knee. This is located well below the bottom of his bermuda shorts and would be quite visible during the summer. He remains restricted in his activities. He can no longer ride his mountain bike for recreation, he has difficulty climbing stairs, he no longer has the walking or running speed he had in carrying out the duties of his occupation.
The court awards the following damages as being fair, just and reasonable:
ECONOMIC:
1. Medical $10,199.48
2. Lost sick time and overtime 3,725.98
$13,925.46
NON ECONOMIC:
1. Pain and suffering $42,000.00
 2. 10% permanency of knee at a stipulated 28 year life expectancy 50,000.00
3. Scar 8,000.00
$100,000.00
TOTAL ECONOMIC AND NON ECONOMIC $113,925.46
 REDUCED BY 15% APPORTIONMENT OF LIABILITY TO PLAINTIFF $113,925.46 @ 85% ATTRIBUTABLE TO DEFENDANT $96,836.64
REDUCED BY COLLATERAL SOURCE PAYMENT $10,150.00
NET $86,686.64
As in most fall down cases there is a duty of the plaintiff CT Page 10397 to exercise due care in how and where he walks. From the evidence, the court believes plaintiff in that regard was 15% responsible for the accident.
Accordingly, the court finds the plaintiff has sustained his burden of proof that the defendant was negligent and that the negligence was the proximate cause of plaintiff's injuries and that defendant's negligence was 85% of the cause of the accident.
Judgment is hereby entered for the plaintiff against the defendant as aforesaid in the amount of $86,686.64.
Rittenband, J.